Matter of Giuliani (2021 NY Slip Op 04086)





Matter of Giuliani


2021 NY Slip Op 04086


Decided on June 24, 2021


Appellate Division, First Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided and Entered: June 24, 2021
SUPREME COURT, APPELLATE DIVISION
First Judicial Department

Rolando T. Acosta,P.J.,
Dianne T. Renwick
Sallie Manzanet-Daniels
Judith J. Gische
Barbara R. Kapnick, JJ.


Motion No. 2021-00491 Case No. 2021-00506 

[*1]In the Matter of Rudolph W. Giuliani (Admitted as Rudolph William Giuliani), an Attorney and Counselor-at Law: Attorney Grievance Committee for the First Judicial Department, Petitioner, Rudolph W. Giuliani, (OCA Atty. Registration No. 1080498.), Respondent.



Disciplinary proceedings instituted by the Attorney Grievance Committee for the First Judicial Department. Respondent was admitted to the Bar of the State of New York at a Term of the Appellate Division of the Supreme Court for the Second Judicial Department on June 25, 1969.




Jorge Dopico, Chief Attorney,
Attorney Grievance Committee, New York
(Kevin M. Doyle, of counsel), for petitioner.
Barry Kamins, Esq. and John Leventhal, Esq., Aidala, Bertuna & Kamins, P.C., for respondent.



Per Curiam 


The Attorney Grievance Committee moves for an order, pursuant to Judiciary Law §90(2) and the Rules for Attorney Disciplinary Matters (22 NYCRR) §1240.9(a)(5), immediately suspending respondent from the practice of law based upon claimed violations of rules 3.3(a); 4.1; 8.4(c) and 8.4(h) of the Rules of Professional Conduct (22 NYCRR 1200.0) (Rules of Conduct or RPC). Respondent was admitted to practice as an attorney and counselor at law in the State of New York on June 25, 1969, under the name Rudolph William Giuliani. He maintains a law office within the First Judicial Department.
For the reasons that follow, we conclude that there is uncontroverted evidence that respondent communicated demonstrably false and misleading statements to courts, lawmakers and the public at large in his capacity as lawyer for former President Donald J. Trump and the Trump campaign in connection with Trump's failed effort at reelection in 2020. These false statements were made to improperly bolster respondent's narrative that due to widespread voter fraud, victory in the 2020 United States presidential election was stolen from his client. We conclude that respondent's conduct immediately threatens the public interest and warrants interim suspension from the practice of law, pending further proceedings before the Attorney Grievance Committee (sometimes AGC or Committee). The Nature of this Proceeding During the course of this ongoing investigation into numerous complaints of respondent's alleged professional misconduct, the AGC seeks respondent's immediate suspension from the practice law in the State of New York. Under certain circumstances, such serious interim relief is available, pending a full formal disciplinary proceeding. Interim suspension is available even where formal charges have not yet been filed (22 NYCRR 1240.9[a]).
All attorneys who are licensed to practice law in New York are subject to the Rules of Conduct, which establish a framework for the ethical practice of the law and a lawyer's duties as an officer of the legal system (Preamble to the Rules of Professional Conduct, ¶¶ 1, 8). Violation of these rules may lead to professional discipline (22 NYCRR 1240). The ultimate purpose of any disciplinary proceeding, however, is not to impose punishment for breaches of the Rules of Conduct, but rather "to protect the public in its reliance upon the integrity and responsibility of the legal profession" (Matter of Nearing, 16 AD2d 516, 518 [1st Dept 1962]; see Matter of Gould, 4 AD2d 174 [1st Dept 1957]).
Each Judicial Department of theAppellate Divisions of the New York Supreme Court is responsible for the enforcement of the Rules of Professional Conduct within its departmental jurisdiction (Judiciary Law § 90[2]). Attorney Grievance Committees, either upon receipt of a written complaint, or acting sua sponte, are charged with investigating misconduct [*2]through various means, including interviewing witnesses, directing the attorney under investigation to submit written responses or appear for a formal interview, and other actions necessary to investigate the complaint (22 NYCRR 1240.7). Once the investigation is complete, the Committee may commence a formal proceeding in which the attorney has the right to be heard. If the Committee concludes that the attorney may face public discipline, then, consistent with the objective of "protect[ing] the public, maintain[ing] the integrity and honor of the profession, or deter[ing] others from committing similar misconduct," the matter is brought before the Appellate Division (22 NYCRR 1240.7[d][2][v]; see also 1240.8; Matter of Nearing, 16 AD2d at 518). The Court is tasked with the responsibility of reviewing the record and deciding whether there has been any misconduct and if so, what the appropriate discipline would be (22 NYCRR 1240.8).
In certain cases, the Committee may, during the pendency of its investigation, make a motion to the Court for an attorney's interim suspension. Interim suspension is a serious remedy, available only in situations where it is immediately necessary to protect the public from the respondent's violation of the Rules (22 NYCRR 1240.9; see Matter of Liebowitz, 2020 WL 7421390 [SD NY 2020]). At bar, the AGC is proceeding on the basis that there is uncontroverted evidence of professional misconduct (22 NYCRR 1240.9[a][5]; Matter of Aris, 162 AD3d 75, 81 [1st Dept 2018]; Matter of Pomerantz, 158 AD3d 26, 28 [1st Dept 2018]).[FN1] Importantly, when an attorney is suspended on an interim basis, he or she nonetheless has an opportunity for a post-suspension hearing (22 NYCRR 1240.9[c]). Uncontroverted Claims of Misconduct Only uncontroverted claims of professional misconduct may serve as a basis for interim suspension on this motion. In connection with its claim that uncontroverted attorney misconduct has occurred, the AGC relies upon the following provisions of the New York Rules of Professional Conduct:
rule 3.3 which provides that: "(a) A lawyer shall not knowingly: (1) make a false statement of fact or law to a tribunal . . . ."
rule 4.1 which provides that: "In the course of representing a client, a lawyer shall not knowingly make a false statement of fact or law to a third person," and
rule 8.4 "A lawyer or law firm shall not: . . . (c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation, . . . or (h) engage in any other conduct that adversely reflects on the lawyer's fitness as a lawyer."
Under the Rules of Professional Conduct, the prohibition against false statements is broad and includes misleading statements as well as affirmatively false statements (Matter of Antoine, 74 AD3d 67, 72 [1st Dept 2010]; Matter of Piepes, 259 AD2d 135, 137 [2d Dept 1999]; see ABA Model Rule 4.1, commentary ["Misrepresentations can also occur by partially true, but misleading statements or omissions that are the equivalent [*3]of affirmative false statements"]). In addition, the Rules concern conduct both inside and outside of the courtroom (see Matter of Coyne, 136 AD3d 176 [1st Dept 2016]; Matter of Liotti, 111 AD3d 98 [1st Dept 2013], lv denied 22 NY3d 862 [2014]; Matter of Rios, 109 AD3d 64 [1st Dept 2013]; Matter of Krapacs, 189 AD3d 1962 [3d Dept 2020]).
In general, the AGC relies upon statements that respondent made following the 2020 election at press conferences, state legislative hearings, radio broadcasts (as both a guest and host), podcasts, television appearances and one court appearance. Respondent concedes that the statements attributed to him in this motion were all made in the context of his representation of Donald J. Trump and/or the Trump campaign (Giuliani affidavit ¶¶ 8, 32).
Preliminary Issues
Respondent raises an overarching argument that the AGC's investigation into his conduct violates his First Amendment right of free speech.[FN2] He does not attack the constitutionality of the particular disciplinary rules; he seemingly claims that they are unconstitutional as applied to him. We reject respondent's argument. This disciplinary proceeding concerns the professional restrictions imposed on respondent as an attorney to not knowingly misrepresent facts and make false statements in connection with his representation of a client. It is long recognized that "speech by an attorney is subject to greater regulation than speech by others" (Gentile v State Bar of Nevada, 501 US 1030, 1051 [1991]). Unlike lay persons, an attorney is "a professional trained in the art of persuasion" (Ohralik v Ohio State Bar Assn., 436 US 447, 465 [1978]). As officers of the court, attorneys are "an intimate and trusted and essential part of the machinery of justice" (Gentile v State Bar of Nevada, 501 US at 1072 [internal quotation marks omitted]). In other words, they are perceived by the public to be in a position of knowledge, and therefore, "a crucial source of information and opinion" (Gentile v State Bar of Nevada, 501 US at 1056 [internal quotations marks omitted]). This weighty responsibility is reflected in the "ultimate purpose of disciplinary proceedings [which] is to protect the public in its reliance upon the integrity and responsibility of the legal profession" (Matter of Nearing, 16 AD2d at 518). While there are limits on the extent to which a lawyer's right of free speech may be circumscribed, these limits are not implicated by the circumstances of the knowing misconduct that this Court relies upon in granting interim suspension in this case (see Kathleen M. Sullivan, The Intersection of Free Speech and the Legal Profession: Constraints on Lawyers' First Amendment Rights, 67 Fordham L Rev 569 [1998] available at https://ir.lawnet.fordham.edu/flr/vol67/iss2/11/ [last accessed June 1, 2021]).[FN3]
Respondent also raises lack or absence of knowledge as a general defense, stating that even if his statements were false or misleading, he did not make the statements [*4]knowing they were false when he made them. We agree that the Rules of Professional Conduct only proscribe false and misleading statements that are knowingly made. Both rules 3.3 and 4.1, expressly provide for an element of knowingness. Rule 8.4 (c), however, contains no such express element. In New York there are no cases which directly hold that a violation of rule 8.4(c) must be knowing, although there is authority that implies it. In a Federal case applying New York's Rules, the court found that there was a violation of rule 8.4(c) where false statements made by the offending attorney were not inadvertent, but were knowing (Matter of Gilly, 206 F Supp 3d 940, 944 [SD NY 2016]). This Court thereafter imposed reciprocal discipline based on that finding (Matter of Gilly, 149 AD3d 230 [1st Dept 2017]). Sister state jurisdictions have held that knowledge is a required element of misconduct in violation of rules identical to RPC 8.4(c) (see Office Of Disciplinary Counsel v Anonymous Attorney A., 552 Pa 223, 230, 714 A2d 402, 406 [1998] [listing sister states requiring a culpable mental state for violation of rule 8.4(c)]; see also Attorney Grievance Commn. of Maryland v Dore, 433 Md 685, 698, 73 A3d 161, 169 [2013][holding that violation of rule 8.4(c) requires a knowingly dishonest statement]). We, therefore, hold that in order to find a violation of RPC 8.4(c), the AGC is required to satisfy a knowing standard. Knowingness is expressly defined in the Rules of Professional Conduct. Rule 1.0(k) provides that "[k]nowingly," "known," "know" or "knows" "denotes actual knowledge of the fact in question. A person's knowledge may be inferred from circumstances." Thus, the element of knowingness must be considered in connection with each particular claim of misconduct.
On this motion, whenever the AGC has sustained its burden of proving that respondent made knowing false and misleading factual statements to support his claim that the presidential election was stolen from his client, respondent must then demonstrate that there is some legitimate dispute about whether the statement is false or whether the statement was made by him without knowledge it was false. Conclusory or vague arguments will not create a controverted issue as to whether there has been misconduct. Consequently, once the AGC has established its prima facie case, respondent's references to affidavits he has not provided, or sources of information he has not disclosed or other nebulous unspecified information, will not prevent the Court from concluding that misconduct has occurred.[FN4] Respondent cannot create a controverted issue of misconduct based upon what he does not submit to this Court (see S.J. Capelin Assoc. v Globe Mfg. Corp., 34 NY2d 338, 342 [1974] [the plaintiff did not raise issue of fact where affidavit merely stated bald, conclusory assertions and there was no claim that facts were not within the plaintiff's control]; see also Primiano Elec. Co. v HTS-NY, LLC, 173 AD3d 620, 622[*5][1st Dept 2019] [the defendant failed to raise an issue of fact by relying on the contents of an expert report which was, in turn, based on an unsubmitted report of a third-party's opinion]). Nor will offers to provide information at a later time, or only if the Court requests it, suffice.
Instances of Attorney Misconduct In making this motion, the AGC primarily relies on claims that respondent made false and misleading factual statements to cast doubt on the reliability of the results of the 2020 presidential election, in which Joseph R. Biden was constitutionally certified and then inaugurated as the 46th President of the United States. We find that the following false statements made by respondent constitute uncontroverted proof of respondent's professional misconduct.
Respondent repeatedly stated that in the Commonwealth of Pennsylvania more absentee ballots came in during the election than were sent out before the election. The factual "proof" he claimed supported his conclusion was that although Pennsylvania sent out only 1,823,148 absentee ballots before the election, 2,589,242 million absentee ballots were then counted in the election. This factual statement regarding the number of ballots mailed out before the election was simply untrue. The true facts are that 3.08 million absentee ballots were mailed out before the general election, which more than accounted for the over 2.5 million mail-in ballots that were actually tallied. Notwithstanding the true facts, respondent repeatedly advanced false statements that there were 600,000 to 700,000 fabricated mail-in ballots, which were never sent to voters in advance of the election.[FN5] Respondent made these false claims during his November 8, 2020 radio program, Uncovering the Truth with Rudy Giuliani & Dr. Maria Ryan, during a November 25, 2020 meeting of the Republican State Senate Majority Policy Committee in Gettysburg, Pennsylvania, during a December 2, 2020 meeting of the Michigan House Oversight Committee, during his December 17, 2020 broadcast of the radio show Chat with the Mayor, and he repeated it during an episode of Steve Bannon's the War Room: Pandemic podcast on December 24, 2020.
Respondent does not deny that his factual statement, that only 1.8 million mail-in ballots were requested, was untrue. His defense is that he did not make this misstatement knowingly. Respondent claims that he relied on some unidentified member of his "team" who "inadvertently" took the information from the Pennsylvania website, which had the information mistakenly listed (Giuliani affidavit ¶49). There is simply no proof to support this explanation. For instance, there is no affidavit from this supposed team member who is not identified by name or otherwise, nor is there any copy of the web page that purportedly listed the allegedly incorrect data. In fact, the only proof in this record is the official data on the Pennsylvania open data portal correctly listing the ballots requested as 3.08 million[*6].
The above identified misstatements violate Rules of Professional Conduct 4.1 and 8.4(c). On November 17, 2020 respondent appeared as the attorney for plaintiff on a matter captioned Donald J. Trump for President, Inc. v Boockvar (Boockvar), in the United States District Court for the Middle District of Pennsylvania (502 F Supp 3d 899, affd 830 Fed Appx 377 [3d Cir 2020]). He was admitted pro hac vice based on his New York law license.
Respondent repeatedly represented to the court that his client, the plaintiff, was pursuing a fraud claim, when indisputably it was not. Respondent's client had filed an amended complaint before the November 17, 2020 appearance in which the only remaining claim asserted was an equal protection claim, not based on fraud at all. The claim concerned the experience of two voters having their mail-in ballots rejected and challenged the notice and cure practices concerning mail-in ballots in different counties.
The plaintiff's original complaint had included claims about canvassing practices. The plaintiff, however, voluntarily withdrew those claims when it served the amended complaint. Notwithstanding, respondent insisted on extensively arguing a fraud case based on the withdrawn canvassing claims. [FN6][FN7]
Respondent's mischaracterization of the case was not simply a passing mistake or inadvertent reference. Fraud was the crown of his personal argument before the court that day. In his opening remarks, respondent claimed that the allegations in the complaint concerned "widespread, nationwide voter fraud of which this is a part ." He persisted in making wide ranging conclusory claims of fraud in Pennsylvania elections and other jurisdictions allegedly occurring over a period of many years. Respondent argued that the plaintiff's fraud arguments pertained to the canvassing claim, notwithstanding that there was neither a fraud nor a canvassing claim before the court. Respondent's fraud argument spanned pages 12 to 31 of the transcript.
After opposing counsel pointed out, and respondent's own co-counsel agreed, that the plaintiff had asserted no claims of fraud the court made the following inquiries and received the following answers from respondent:
"THE COURT: So it's correct to say then that you're not alleging fraud in the amended complaint?
"RESPONDENT: No, Your Honor, it is not, because we incorporate by reference in 150 all of the allegations that precede it, which include a long explanation of a fraudulent, fraudulent process, a planned fraudulent process.
"THE COURT: So you are alleging fraud?
RESPONDENT: Yes, Your Honor."
Later in the transcript, after the court pointed respondent to the amended complaint, the following further court inquiries and responses occurred:
"THE COURT: . . . So the amended complaint—does the amended complaint plead fraud with particularity?
"RESPONDENT: No, Your Honor. And it doesn't plead fraud. It pleads the  it pleads the plan or scheme that we lay out in 132 to 149 without [*7]characterizing it."
These proceedings were open by phone line to as many as 8,000 journalists and other members of the public. At the outset of the argument it was reported that at least 3,700 people had already dialed in.
It is considered a false and misleading statement under the Rules of Professional Conduct to mispresent the status of a pending proceeding, whether in or out of court (Matter of Zweig, 117 AD3d 96 [1st Dept 2014]; Matter of Napolitano, 78 AD3d 18 [2d Dept 2010]; Matter of Passetti, 53 AD3d 1031 [3d Dept 2008]). Stating that a case presents a fraud claim when it does not, is a false and misleading statement about the status of a pending proceeding.
Respondent argues that there was no misconduct because he truthfully told the court that day that there were no fraud claims. This defense rings hollow. Respondent's original position, that there was a fraud claim, was made despite an amended complaint in which his very own client withdrew any fraud related claim. Respondent's own co-counsel represented, in respondent's presence, that the plaintiff was not asserting a fraud claim and there was extensive argument by opposing counsel. It is indisputable that respondent had to be aware that there were no fraud claims in the case. Significant time and effort were expended on respondent's false misrepresentations to the court regarding the nature of the proceedings. This resulted in respondent's arguments in support of fraud appearing to be seemingly unanswered on the record and misleading the listening public, because fraud was not a part of the case. Respondent's so-called admission of the true status of the case did not occur until he was pressed by the court to concede the point at page 118 of the transcript.
The confusion respondent created by falsely insisting that there was a fraud/canvassing claim before the court persisted beyond that court appearance. The parties were given leave to submit briefs. Plaintiff's brief included argument about the canvassers' claim, even though it had been withdrawn. Consequently, the court addressed the claim in its subsequent decision and dismissed it on the merits. In footnote 127 the court stated "Count I makes no mention of the poll-watching allegations, nor does it seek relief for any violation of law on the basis of those allegations. Out of an abundance of caution, however, the Court considers whether these allegations state a claim" (Boockvar, 502 F Supp 3d at 921 n 127).
The above identifiedmisstatements violate RPC 8.4(c). These misstatements violate RPC 3.3 because they were made before a tribunal. These misstatements violate RPC 4.1 because they were made to third parties consisting of over 3,700 members of the press and the public. Respondent repeatedly stated that dead people "voted" in Philadelphia in order to discredit the results of the vote in that city. He quantified the amount of dead people who voted at various times as 8,021; while also reporting the number as 30,000[*8]. As the anecdotal poster child to prove this point, he repeatedly stated that famous heavyweight boxer Joe Frazier continued to vote years after he was dead and stated on November 7, 2020 "he is still voting here." The public records submitted on this motion unequivocally show that respondent's statement is false. Public records show that Pennsylvania formally cancelled Mr. Frazier's eligibility to vote on February 8, 2012, three months after he died.
As for respondent's argument that his misstatements were unknowing, respondent fails to provide a scintilla of evidence for any of the varying and wildly inconsistent numbers of dead people he factually represented voted in Philadelphia during the 2020 presidential election. Although respondent assured the public that he was investigating this claim, respondent has not provided this tribunal with any report or the results of any investigation which supports his statements about how many dead voters he claims voted in Philadelphia in the 2020 presidential election. Respondent claims his statements were justified because the state of Pennsylvania subsequently agreed to purge 21,000 dead voters from its rolls in 2021. This fact, even if true, is beside the point. This statistic concerns the whole state. Purging voter rolls does not prove that the purged voters actually voted in 2020 and per force it does not prove they voted in Philadelphia. It does not even prove that they were dead in November 2020. Moreover, the number of statewide purged voters (21,000) bears no correlation to the numbers of dead voters respondent factually asserted voted in Philadelphia alone (either 8,000 or 30,000). Clearly any statewide purging of voters from the voting rolls in 2021 could not have provided a basis for statements made by respondent in 2020, because the information did not exist. Regarding Mr. Frazier, respondent claims he reasonably relied on the reporting of a "blogger." The blog article provided on this motion, however, never claims that Mr. Frazier voted in the 2020 election. Nor could it, because the claims made in the article (in which respondent was quoted) are based upon an alleged review of public records from 2017 and 2018.[FN8]
Respondent made these false statements at least twice before the AGC brought this motion; first at a November 7, 2020 press conference at Four Seasons Total Landscaping and again during the November 25, 2020 meeting of the Republican State Senate Majority Policy Committee in Gettysburg, Pennsylvania. Despite the unequivocal evidence provided in this very motion, that Mr. Frazier is not on the Pennsylvania voting rolls, respondent continued to endorse this fictionalized account in the March 4, March 11 and March 14, 2021 episodes of his broadcast radio show Chat with the Mayor, all of which aired after this motion was brought.
The above identifiedmisstatements violate RPC 4.1 and RPC 8.4(c ).
Respondent repeated to lawmakers and the public at large numerous false and misleading [*9]statements regarding the Georgia presidential election results. These statements, as particularized below, were all knowingly made with the object of casting doubt on the accuracy of the vote. Respondent's general claim, without providing this Court with any documentary support, that he relied on "hundreds of pages of affidavits and declarations in [respondent's] possession that document gross irregularities " will not suffice to controvert the specific findings that he knowingly made the false statements that are particularized below.
Respondent made extensive and wide-ranging claims about Dominion Voting Systems Inc.'s voting machines manipulating the vote tallies to support his narrative that votes were incorrectly reported. Georgia, however, had completed a hand count of all ballots cast in the presidential audit.[FN9] The hand audit, which relied exclusively on the printed text on the ballot-marking device, or bubbled-in the choice of the absentee ballot, confirmed the results of the election with a zero percent risk limit. Respondent's statement that the vote count was inaccurate, without referencing the hand audits, was misleading. By law, this audit was required to take place following the election and be completed no later than December 31, 2020 (Ga Ann § 21-2-498). Respondent's statements were made while the hand audit was proceeding and after it concluded. We understand that Dominion has sued respondent for defamation in connection with his claims about their voting machines (Complaint, US Dominion, Inc. v Giuliani, 1:21-cv-00213, US District Court, District of Columbia [Washington], January 25, 2021). Consequently, we do not reach the issue of whether respondent's claims about the Dominion voting machines were false, nor do we need to.
In view of the hand counts conducted in Georgia, we find that respondent's statements about the results of the Georgia election count are false. Respondent provides no basis in this record for disputing the hand count audit. Respondent made these statements at least on December 3, 2020 when appearing before the Georgia Legislature's Senate Judiciary Committee, during a December 6, 2020 episode of the radio show Uncovering the Truth, during a December 22, 2020 episode of his radio show Chat with the Mayor, he alluded to it in a December 27, 2020 episode of Uncovering the Truth, and then again during a January 5, 2021 episode of the War Room podcast. The above identifiedmisstatements violate RPC 4.1 and RPC 8.4(c).
At various times, respondent claimed that 65,000 or 66,000 or 165,00 underage voters illegally voted in the Georgia 2020 election. The Georgia Office of the Secretary of State undertook an investigation of this claim. It compared the list of all of the people who voted in Georgia to their full birthdays. The audit revealed that there were zero (0) underage voters in the 2020 election. While a small number of voters (four) had requested a ballot prior to turning 18, they all turned 18 by the time [*10]the election was held in November 2020. Respondent does not expressly deny the truth of this information. Instead respondent claims that he reasonably relied on "expert" affidavits, including one by Bryan Geels, in believing the facts he stated were true. None of these affidavits were provided to the Court. Respondent claims that Mr. Geels opined that there were "more than 65,000 individuals who voted had registered to vote prior to their 17th birthday" (Giuliani affidavit ¶62). At a bare minimum, the statement attributed to Mr. Geels does not support respondent's claim that the number of underage teenage voters was 165,000. But respondent's statement about what was said to him is insufficient as to all of respondent's statements on underage voters for other reasons. We do not have the affidavit that respondent claims Mr. Geels prepared and he relied on. We do not know when the affidavit was provided to respondent. We do not know what data or source information Mr. Geels relied on in reaching his conclusion, nor do we know what methodology Mr. Geels used for his analysis. Other than respondent calling him an "expert," we do not know Mr. Geels' actual area of expertise or what qualifies him as such (see Guide to NY Evid Rule 7.01, Opinion of Expert Witness). Merely providing names and conclusory assertions that respondent had a basis for what he said, does not raise any disputed issue about whether misconduct has occurred.
Respondent made statements regarding underage voters in Georgia on his radio show, Chat with the Mayor, at least on January 5, January 7, and January 22, 2021. He then repeated this statement on the April 27th episode of his radio show, after this motion for interim suspension was brought.
The above identifiedmisstatements violate RPC 4.1 and RPC 8.4(c).
Respondent stated to lawmakers, and the public at large, that more than 2,500 Georgia felons voted illegally. The Georgia Secretary of State also investigated this claim. By comparing lists from the Departments of Corrections and Community Supervision, with the list of people who actually voted in November 2020, the Secretary of State identified a universe of 74 potential felony voters, who were then investigated. Even if all 74 identified persons actually voted illegally, the number is nowhere near the 2,500 that respondent claimed and the number would, in any event, be statically irrelevant in supporting a claim that the election was stolen (see Bognet v Secretary Commonwealth of Pa., 980 F3d 336, 351 [3d Cir 2020], cert granted, judgment vacated sub nom Bognet v Degraffenreid -US-, 2021 WL 1520777, 2021 US LEXIS 1952 [2021] [for the plaintiff to have standing, challenged votes must be sufficient in number to change outcome]; Sibley v Alexander, 916 F Supp 2d 58, 62 [DC 2013] [the plaintiff failed to satisfy redressability element where the three challenged electoral votes would not change outcome of election]).[FN10] Respondent's statements that there were 2,500 voting felons [*11]is false.
Respondent claims to have relied on the unproduced affidavit of Mr. Geels for this information as well. Respondent states that Mr. Geels opined that "there could have been" more than 2,500 incarcerated felons who voted (Giuliani affidavit ¶62). This opinion, as phrased and as reported by respondent, is wholly speculative. It is also conclusory, rendering it insufficient for the same reasons as is Mr. Geels' reported opinion regarding underage voters.
On January 5, 2021, during a War Room podcast respondent stated that at least 2,500 felons voted in the Georgia election. The above identifiedmisstatements violate RPC 4.1 and RPC 8.4(c).
Respondent stated that dead people voted in Georgia during the 2020 presidential election. He claimed that he had the names of 800 dead people who voted based upon the number of people who had passed away in 2020. Respondent further stated that this number was really in the thousands. At another point he claimed that 6,000 dead people had voted. This claim was refuted by the Georgia Secretary of State. After reviewing public records, the Secretary of State concluded that potentially two votes may have been improperly cast in the name of dead voters in the 2020 election and those instances were being investigated. Respondent's claim of thousands of dead voters is false. So is respondent's claim of 800 dead voters. The two potentially dead voters discovered by the Secretary of State during its investigation is not statistically relevant to affect election results and does not support any narrative of fraud. Respondent does not claim that either of the identified experts he relied upon for information about the Georgia election made any statement to him whatsoever regarding the number of dead people in whose names votes were allegedly cast in the 2020 election and he does not provide any other source for the false numerical information he disseminated (Giuliani affidavit ¶62).
On December 22, 2020, during a War Room podcast, respondent stated that 6,000 dead people voted. On January 3, 2021, during an episode of Uncovering the Truth, respondent stated that 10,515 dead people voted. On January 5, 2021, during a War Room podcast, respondent stated that 800 or more dead people voted in the Georgia election. On the April 7, 2021 episode of his radio show Chat with the Mayor, respondent challenged the Georgia Secretary of State's finding that only potentially two votes were cast in the name of dead voters, despite having no evidence to refute the facts developed after investigation of public records. The April 7th false statement was made after this motion for interim suspension was brought. The above identifiedmisstatements violate RPC 4.1 and RPC 8.4(c).
Respondent represented that video evidence from security cameras depicted Georgia election officials engaging in the illegal counting of mail-in ballots. Although respondent acknowledged that he had viewed the surveillance videos in their entirety (this statement [*12]is available at https://rudygiulianics.com/episode/video-evidence-caught-red-handed-trump-won-georgia-rudy-giuliani-ep-92/3:56 [last accessed June 1, 2021]) the version of the videos shown to the public was comprised only of snippets.[FN11] The gist of his claim was that illegal ballots were being surreptitiously retrieved from suitcases hidden under a table and then tabulated. In fact, the entirety of the videos shows the "disputed" ballots were among those in a room filled with people, including election monitors, until about 10:00 pm. At about 10:00 p.m., the boxes — not suitcases — containing the ballots were placed under a table in preparation for the poll watchers to leave for the evening. Those boxes were reopened and their contents retrieved and scanned when the state official monitor intervened, instructing the workers that they should remain to tabulate the votes until 10:30 p.m. that evening. When viewed in full context and not as snippets, the videos do not show secreting and counting of illegal ballots. Based upon the claim, however, the Georgia Secretary of State conducted an investigation. The video tapes were viewed in their entirety by the Secretary's office, law enforcement, and fact checkers who, according to Secretary of State Brad Raffensperger, all concluded that there was no improper activity.
Respondent's argument with respect to the video is that a reasonable observer could conclude that there was an illegal counting of the mail-in ballots. If, as respondent claims, he reviewed the entire video, he could not have reasonably reached a conclusion that illegal votes were being counted. We disagree that the video can be viewed as evidence of illegal conduct during the vote tabulation process or that it provided a reasonable basis for respondent's conclusions.
Respondent showed the snippets of video and/or made false statements regarding its content on at least the following occasions: the podcast Rudy Giuliani's Common Sense on December 4, 2020, the radio show Uncovering the Truth on December 6, 2020 and then again on the same radio show on December 27, 2020 and January 3, 2021; on December 3, 2020 at a hearing before the Georgia State Legislature; and yet again on December 8, 2020 and December 10, 2020 on respondent's Chat with the Mayor radio program, and on December 19, 2020, and January 5, 2021 as a guest on the War Room podcast. The above identifiedmisstatements violate RPC 4.1 and RPC 8.4(c). Respondent made false and misleading statements that "illegal aliens" had voted in Arizona during the 2020 presidential election. These false facts were made by respondent to perpetuate his overall narrative that the election had been stolen from his client.
On November 30, 2020, respondent appeared before a group of Arizona legislators at the Hyatt Regency Hotel in Phoenix. It was acknowledged during that session that no statewide check on undocumented noncitizens had been performed. In other words, there was no data available [*13]from which to draw any conclusion about undocumented noncitizens. Nonetheless, respondent persisted in stating, during that same session, that there were "say" five million "illegal aliens" in Arizona and that "[i]t is beyond credulity that a few hundred thousand didn't vote . . . ." Undeterred by the lack of any empirical evidence, in a December 17, 2020 episode of Chat with the Mayor, respondent queried "Do you think more than 10,000 illegal aliens voted in Arizona?....We know that way more than 10,000 illegal immigrants voted." During an appearance on the War Room podcast on December 24, 2020 respondent once again claimed with respect to the number of undocumented noncitizens who voted in Arizona that "the bare minimum is 40 or 50,000, the reality is probably about 250,000 . . . ." He then used these unsubstantiated figures to support a claim that Trump won Arizona by about 50,000 votes (id.). After the New Year, in another episode of the War Room podcast, the number of "illegal immigrants" respondent was claiming had voted illegally changed yet again. This time respondent claimed there were 32,000 of such illegal votes. Respondent admitted in the podcast that he did not have the "best sources" to justify this estimate, but stated that he was relying on "newspaper and records" for his claims (id.). Respondent later either reiterated and/or agreed with statements made by others, that undocumented noncitizens had voted in Arizona in the 2020 election; he made these statements during the March 9th, 11th, and April 27, 2021 broadcasts of his Chat with the Mayor radio show and on April 21, 2021 during an appearance on the War Room podcast. Respondent made these misstatements most recently after the AGC brought this motion for his interim suspension.
On their face, these numerical claims are so wildly divergent and irreconcilable, that they all cannot be true at the same time. Some of the wild divergences were even stated by respondent in the very same sentence. Moreover, at the November 30, 2020 hearing, when it was brought to respondent's attention that no study to support the conclusions had been done, respondent persisted in making these false factual statements. In January 2021, respondent even admitted that he did not have the "best sources" to justify the numbers he was stating as fact. Nonetheless, respondent has failed to produce any sources, whether "best" or marginal, to support any of the figures he has presented to the public with authority. He has not identified, let alone produced the "newspaper and records" he claimed were the bases for his assertions when he made them.
Respondent argues that he reasonably relied on Arizona State Senator Kelly Townsend, who respondent claims collected information on noncitizen voters. Respondent does not tell us what Senator Townsend actually said to him or when she said it. We do not have an affidavit or any statement from Senator Townsend. We simply have none of the information Senator Townsend [*14]is claimed to have collected. Saying that Senator Townsend collected information does not explain any of respondent's numbers, let alone why they are wildly divergent. Respondent's claim, that he also relied on "other witnesses" who testified that thousands of individuals voted despite any proof of citizenship, lacks detail and is not specific enough to be considered by this Court as probative. Not one of those witnesses is identified, none of their testimony is provided, nor has respondent provided an affidavit from any of them. Respondent cannot rely on this "evidence" to controvert that he knowingly made false statements to the public about the number of "illegal aliens" or "illegal immigrants" voting in the Arizona 2020 presidential election. The above identifiedmisstatements violate RPC 4.1 and RPC 8.4(c ). We find that all of these acts of misconduct, when considered separately or taken together, also establish that respondent violated RPC 8.4 (h) because his conduct adversely reflects on his fitness as a lawyer. We recognize that the AGC has identified other instances of respondent's misconduct. We make no substantive decision on those additional claims at this time because the record is insufficiently developed on those claims in this motion for interim relief. The additional claims may be part of any formal charges that the AGC will interpose in the full disciplinary proceeding that will follow this interim suspension. We find, nonetheless, that the incidents we have identified in this decision satisfy the requirement of uncontroverted misconduct required for an interim suspension.
Immediate Threat to the Public Interest Uncontroverted claims of misconduct alone will not provide a basis for interim suspension, unless there is a concomitant showing of an immediate threat to the public interest (22 NYCRR 1240.9[a]). We recognize that this case presents unique circumstances. Nonetheless, there are certain factors we generally consider in connection with whether an immediate threat of harm to the public has been established.
Violation of the Rules of Professional Conduct in and of themselves necessarily means that there is harm to the public (Matter of Nearing, 16 AD2d at 516). One obvious factor to consider on an interim suspension application is whether the misconduct is continuing (Matter of Singer, 301 AD2d 336, 337 [1st Dept 2002]). Even where there are no actual incidents of continuing misconduct, immediate harm threatening the public can be based on the risk of potential harm when considered in light of the seriousness of the underlying offense (Matter of Tannenbaum, 16 AD3d 66 [1st Dept 2005]). Many cases where the seriousness of the offending conduct alone satisfies the immediate threat requirement for an interim suspension concern the mishandling of money (see Matter of Hornstein, 121 AD3d 1 [1st Dept 2014]; Matter of Jackson, 103 AD3d 10 [1st Dept 2013]; Matter of Schachter, 100 AD3d 45 [1st Dept 2010]; Matter of Tannenbaum [*15]at 67). The broader principle to be drawn from these cases is that when the underlying uncontroverted evidence of professional misconduct is very serious, the continued risk of immediate harm to the public during the pendency of the underlying disciplinary proceeding is unacceptable. For example, we have ordered interim suspensions where the offense is serious, although the risk of recurrence is slight, because the attorney intends to resign from the practice of law (Matter of Kressner, 72 AD3d 112 [1st Dept 2010]). Another consideration, related to the seriousness factor, is whether the underlying misconduct is likely to result in a substantial sanction at the conclusion of the formal disciplinary hearing proceeding. We adopt this factor in reliance on sister state authority on the same issue (see Tapp v Ligon, 2013 Ark 259, 428 SW3d 492 [2013] [interim suspension likened to a preliminary injunction; substantial likelihood that significant sanction would be imposed]; In re Discipline of Trujillo, 24 P3d 972 [Utah 2001] [substantial likelihood, based on all the available evidence, that a significant sanction will be imposed on the attorney at the conclusion of any pending disciplinary proceeding]).
Consideration of these factors in this case leads us to conclude that the AGC has made a showing of an immediate threat to the public, justifying respondent's interim suspension. We find that there is evidence of continuing misconduct, the underlying offense is incredibly serious, and the uncontroverted misconduct in itself will likely result in substantial permanent sanctions at the conclusion of these disciplinary proceedings.
Respondent argues that there is no immediate threat of future harm, because he has and will continue to exercise personal discipline to forbear from discussing these matters in public anymore. He also claims that because legal matters following the 2020 election have concluded, he will no longer be making any statements about the election under the authority of being an attorney.
Notwithstanding respondent's claim that he has exercised self-restraint by not publicly commenting on the election, there are numerous instances demonstrating the opposite. Focusing only on the false statements that support our conclusion of uncontroverted misconduct (and not his statements about 2020 election matters generally), respondent has made or condoned the following false statements just since the AGC brought this application for his interim suspension: On his March 4, 2021 radio show Chat with the Mayor, respondent reprised his claim that Joe Frazier had voted from the grave. On the March 9th episode of his radio show Chat with the Mayor, respondent stated in substance that immigrants voted illegally in the 2020 presidential election. On the March 11th episode of his radio show Chat with the Mayor he again referred to Joe Frazier and "illegals" voting in Arizona. On the March 14th episode of Chat with the Mayor, respondent recounted the [*16]tale of Joe Frazier voting after he died and joked with his co-host about the Philadelphia cemeteries emptying on election day. On his April 8th episode of Chat with the Mayor, respondent disputed the fact that in Georgia only two dead people had voted, even though, as previously indicated, respondent had no informational basis for making that statement and disputing the results of Georgia's investigation. On the April 27th episode respondent once again falsely stated that there were 65,000 underage teenage voters who had voted in Georgia. Respondent also stated that there were 38,000 "illegal immigrants" voting in Arizona, while at the same time estimating the number at maybe 5,000 or maybe 100,000 (id.). Imminent threat to the public is established by this continuing pattern of respondent's offending conduct and behavior. We cannot rely on respondent's representations that he will exercise restraint while these proceedings are pending.
Contrary to respondent's assertion, there are many ongoing legal matters all over the United States that arise from the narrative of a stolen election. Respondent himself points to an ongoing audit of the 2020 ballots presently occurring in Maricopa County, Arizona (Arizona Public Integrity Alliance v Fontes, 250 Ariz 58, 475 P3d 303 [2020]). Another audit of the 2020 ballots has just been authorized in Fulton County, Georgia by Chief Judge Brian Amero of the Henry County Superior Court (see Julia Harte, Judge allows self-described anti-fraud group to review Georgia ballots [May 21, 2021], https://www.reuters.com/business/legal/judge-allows-self-described-anti-fraud-group-review-georgia-ballots-2021-05-21/ [last accessed June 1, 2021]). The Federal government and many state legislators are actively engaged in enacting competing laws concerning voting in this country (see e.g. The John Lewis Voting Rights Advancement Act [S4263, 116th Cong. [2019-2020]; The Voting Rights Advancement Act [HR 4, 116th Cong. [2019-2020]; The Voting Rights Advancement Act of 2019 [S561, 116th Cong. [2019]; For the People Act of 2021 [HR 1, SR 1, 117th Cong. [2021]; Iowa SF 413 [signed by the Governor of Iowa on March 8, 2021]; Georgia SB 202 [passed by the Georgia House and Senate on March 25, 2021]; Florida SB 90 [signed by the Governor of Florida on May 6, 2021], Texas S.B.7 [FN12]). Many of the state laws are facing serious court challenges (see e.g. League of United Latin American Citizens of Iowa v Pate, -F Supp 3d-, CVCV-061476 [Dist. Ct., Polk County Iowa]; New Georgia Project v Raffensperger 484 F Supp 3d 1265 [ND Ga 2020], Georgia NAACP v Raffensperger, -F Supp 3d -, No. 1:2021-CV-01259 [ND Ga 2021], AME Church v Kemp, -F Supp 3d -, No. 1:2021-CV-01284 [ND Ga 2021], Asian Americans Advancing Justice -Atlanta v Raffensperger, -F Supp 3d -, No. 1:2021-CV-01333 [ND Ga 2021], VoteAmerica v Raffensperger, -F Supp 3d -, No. 1:2021-CV-01390 [ND Ga 2021], Concerned Black Clergy v Raffensperger, -F Supp 3d-, No. 1:[*17]2021-CV-01728 [ND Ga 2021], Coalition For Good Governance v Raffensperger, -F Supp 3d-, No. 1:20-CV-01677 [ND Ga 2020], Florida Rising v Lee, -F Supp 3d-, No. 4:21-CV-00201 [ND Fla 2021]).
The risk that respondent will continue to engage in future misconduct while this disciplinary proceeding is pending is further borne out by his past, persistent and pervasive dissemination of these false statements in the media. This is not a situation where the uncontroverted misconduct consisted of only a few isolated incidents. Rather, each of the false statements identified and analyzed herein were made multiple times on multiple platforms, reaching countless members of the public. They continued after this motion was brought, and despite respondent facing imminent suspension from the practice of law.
The seriousness of respondent's uncontroverted misconduct cannot be overstated. This country is being torn apart by continued attacks on the legitimacy of the 2020 election and of our current president, Joseph R. Biden.[FN13] The hallmark of our democracy is predicated on free and fair elections. False statements intended to foment a loss of confidence in our elections and resulting loss of confidence in government generally damage the proper functioning of a free society. When those false statements are made by an attorney, it also erodes the public's confidence in the integrity of attorneys admitted to our bar and damages the profession's role as a crucial source of reliable information (Matter of Nearing, 16 AD2d at 516). It tarnishes the reputation of the entire legal profession and its mandate to act as a trusted and essential part of the machinery of justice (Ohralik v Ohio State Bar Assn, 436 US at 447). Where, as here, the false statements are being made by respondent, acting with the authority of being an attorney, and using his large megaphone, the harm is magnified. One only has to look at the ongoing present public discord over the 2020 election, which erupted into violence, insurrection and death on January 6, 2021 at the U.S. Capitol, to understand the extent of the damage that can be done when the public is misled by false information about the elections. The AGC contends that respondent's misconduct directly inflamed tensions that bubbled over into the events of January 6, 2021 in this nation's Capitol. Respondent's response is that no causal nexus can be shown between his conduct and those events. We need not decide any issue of "causal nexus" to understand that the falsehoods themselves cause harm.[FN14] This event only emphasizes the larger point that the broad dissemination of false statements, casting doubt on the legitimacy of thousands of validly cast votes, is corrosive to the public's trust in our most important democratic institutions.
Before Judge Brann in the Boockvar case, respondent himself stated: "I don't know what's more serious than being denied your right to vote in a democracy." We agree. It is the very reason why espousing [*18]false factual information to large segments of the public as a means of discrediting the rights of legitimate voters is so immediately harmful to it and warrants interim suspension from the practice of law.
Accordingly, the AGC's motion should be granted and respondent is suspended from the practice of law in the State of New York, effective immediately, and until further order of this Court.
All concur.
It is Ordered that the motion is granted and respondent is suspended from the practice of law in the State of New York pursuant to Judiciary Law § 90(2) and 22 NYCRR 1240.9(a) (5), effective the date hereof, until such time as disciplinary matters pending before the Committee have been concluded, and until further order of this Court, and
It is further Ordered that respondent is commanded to desist and refrain from the practice of law in any form, either as principal or agent, clerk or employee of another; that respondent is forbidden to appear as an attorney or counselor-at-law before any court, judge, justice, board or commission or other public authority; that respondent is forbidden to give another an opinion as to the law or its application or advice in relation thereto, all effective the date hereof, until such time as disciplinary matters pending before the Committee have been concluded and until further order of this Court, and
It is further Ordered that respondent is directed to fully comply with the provisions of the Court's rules governing the conduct of disbarred or suspended attorneys (see 22 NYCRR 1240.15), which are made a part hereof, and
It is further Ordered that, within 20 days of the date of service of this decision, respondent may submit a request, in writing, to this Court for a post suspension hearing (see 22 NYCRR 1240.9[c]).
Entered: June 24, 2021



Footnotes

Footnote 1:22 NYCRR 1240.9(a) states in pertinent part:
"A respondent may be suspended from practice on an interim basis during the pendency of an investigation or proceeding on application or motion of a Committee ..upon a finding by the Court that the respondent has engaged in conduct immediately threatening the public interest. Such a finding may be based upon . . . (5) other uncontroverted evidence of professional misconduct."

Footnote 2: Giuliani affidavit ¶6 ". . . Petitioner's allegations regarding statements that I made, violates my First Amendment right of free speech . . . " (see also Answer ¶¶ 25-26).

Footnote 3: Notably, at least one Federal court has recently determined attorney efforts to undermine a legitimate presidential election warranted the attorney's referral to the grievance committee (Wisconsin Voters Alliance v Pence, 2021 WL 23298, *2, 2021 US Dist LEXIS 127, *4-6 [DDC Jan. 4, 2021 Civil Action No. 20-3791 (JEB)], and 2021 WL 6359, *1, 2021 US Dist LEXIS 35064, *6 [DDC Feb. 19, 2021]).

Footnote 4: In opposition to this motion, respondent refers to affidavits he has not provided
(Giuliani affidavit ¶¶11, 50, 61, 62, 66). He also relies on a "confidential informant" (Giuliani affidavit ¶82). We do not understand, nor does respondent explain why, as a private attorney seemingly unconnected to law enforcement he would have access to a "confidential informant" that we cannot also have access to. At yet another point respondent claims he relies on a Trump attorney who chooses not to be identified (Giuliani affidavit ¶43). Respondent also refers to hundreds of witnesses, experts, and investigative reports, none of which have been provided or identified (Giuliani affidavit ¶14) and an Excel spreadsheet, also not provided, purportedly listing the names of thousands of deceased voters who allegedly cast ballots in Michigan (Giuliani affidavit ¶51).

Footnote 5: These numbers roughly correlate to mail-in ballots received, less the false amount of mail-in ballots respondent claims were sent out, as adjusted for the overall percentage of mail-in votes that were cast for Biden.

Footnote 6: We accept for purposes of this proceeding respondent's characterization of the withdrawn claim as a fraud claim. It is not clear to us that this characterization is correct, but it does not affect our analysis.

Footnote 7: Coincidently, while the parties were in court that day, they received word that the state claims regarding canvassing had been decided against the plaintiff in the Supreme Court of the State of Pennsylvania (In re Canvassing Observation, 241 A3d 339 [Pa 2020], cert denied sub nom Donald J. Trump for President, Inc. v Degraffenreid, -US-, 141 SCt 1451 [2021]). The plaintiff's subsequent efforts to reinstate the voluntarily withdrawn federal claim concerning the canvassers was also denied in Boockvar.

Footnote 8: The blogger's representation regarding what the public record revealed was inaccurate.

Footnote 9: In this motion, because the AGC only relies on the audit referred to in the Georgia Secretary of State's January 6, 2021 letter to Congress, we only consider this one audit. Georgia's election results were, however, actually audited three times, and no evidence of widespread fraud was discovered (Daniel Funke, Fact check: No evidence of fraud in Georgia election results (June 1, 2021), https://www.usatoday.com/story/news/factcheck/2021/06/01/fact-check-georgia-audit-hasnt-found-30-000-fake-ballots/5253184001/ [last accessed June 12, 2021]).

Footnote 10: On December 1, 2020, former Attorney General William Barr stated that the Department of Justice had uncovered nothing indicating massive election fraud and that there was nothing showing that the outcome of the election would be different.

Footnote 11: The full videos are found at https://securevotega.com/factcheck/. The snippets shown during respondent's show, while once available on YouTube, have been taken down for violating their community standards (https://www.youtube.com/watch?v=PchtaUsRH70 [last accessed June 2, 2021]) 

Footnote 12: As of May 28, 2021, the Brennan Center for Justice reports that more than 14 states have enacted new laws this year that will restrict voting rights (Voting Laws Roundup: May 2021, BrennanCenter.org (May 28, 2021), https://www.brennancenter.org/our-work/research-reports/voting-laws-roundup-May-2021 [last accessed June 2, 2021]).

Footnote 13: E.g. A May 17-19 national poll conducted by Reuters/Ipsos reported that while only 3% of Democrats believe that Trump won the 2020 election, 53% of Republicans so believe (Reuters, 53% of Republicans view Trump as true U.S. president, https://www.reuters.com/world/us/53-republicans-view-trump-true-us-president-reutersipsos-2021-05-24/ [last accessed June 2, 2021])

Footnote 14: Legal causation is an issue in criminal and civil actions that have arisen in the aftermath of the January 6, 2021 Capitol riots. We understand that respondent is a defendant in at least one civil action seeking to hold him responsible for the January 6, 2021 riots (Thompson v Trump, Giuliani, -F Supp 3d-, 1:21-cv-00400, US District Court, District of Columbia [Washington], January 25, 2021).